BUCKHORN INC. v. ORBIS BUCKHORN INC. v. ORBIS CORPORATION MR. ROLAND. Good morning, Chief Judge Rader and also good morning, Judge O'Malley and Judge Rader. May it please the Court, this appeal arises from a fundamental error committed by the District Judge when he held that Plaintiff Scholar had no knowledge of the license agreement. This was a sua sponde error by the Court below, as Scholar never argued that it did not have knowledge of the license agreement. And this is shown in the briefs at 83879 and 38993904. Scholar's only argument below was that the fee-shifting provision did not apply to a contract-based license defense in response to a patent infringement claim, which is a tort case. And the Court below properly rejected this argument, correctly applying California law when it interpreted the cases of Thompson and Express, which is at record A-19 and 20. The Court also held that it was not necessary to assert a claim or a counterclaim on the contract or for a depiratory judgment in order for it to be used. When does unconscionability become part of this equation? Your Honor, unconscionability, if the Court were to reach it, and the Judge below solely held it was unconscionable because of the supposed lack of knowledge of Plaintiff Scholar. And that was the sole basis for the Court's opinion below for unconscionability. And I will address the count. Did any of the parties argue that to the Court, or did the Court come up with that? The Court below came up with that argument on its own. And the error was that the Court failed to distinguish that there were two plaintiffs in the case below, Scholar, the owner of the 592 patent, and Buckhorn, who was merely a licensee. Would you concede, though, that does that mean that if we would agree with you on your position here as it relates to the fee provision under the license, that anything that occurred before Scholar was in the case would not be recoverable? Yes, Your Honor, we are not seeking an application of attorney fees prior to the date of the amended complaint. As we made, I think, clear in our brief, we're seeking from the time the amended complaint was filed when Scholar itself became a named party plaintiff. Yes, that's correct. And at that time, Scholar... Why would you do that, given the relationship between Scholar and Horvitz? Why would I... What would you limit the attorney's fees at that point? To remove an issue that this Court might have to address, because the issue as to Scholar is so clear, because Scholar was actually the signatory entity on the license agreement, which the Court overlooked. Putting aside the question of whether Scholar actually knew as of the time of the filing of the amended complaint, because I realize there's a battle on that, but wouldn't it be fair for the Court to consider, assuming they didn't know as of that, to consider what your friend on the other side described as your delay in providing them with the information that would show that you were really the authorized licensee under that agreement? With all due respect, there was no delay on our side. As the record shows in the exchange of e-mails between our prior counsel and the plaintiff's counsel, Buckhorn was not a signatory or a party on the license agreement, and the prior counsel asked plaintiff's counsel for authorization from Scholar for us to disclose the agreement. I'm not talking about when it was reviewed at Buckhorn. I'm talking about once Scholar became... Your Honor, as shown in the answer filed only two weeks after the amended complaint, there was an express affirmative defense pled in the answer, and it wasn't a boilerplate affirmative defense. It was a very specific affirmative defense, which one identified following. It named the license agreement expressly and said it was the settlement and license agreement dated September 15, 1992, Right, but I'm talking about the documents that would establish that there had been no violation of the transfer provision. Yes, Your Honor. We produced those documents promptly in accordance with the procedures of the district court because discovery starts after there is the initial scheduling conference, which occurred, I believe, in January of 2010. The documents on the transfer were produced in our very first document production in May of 2010, and prior to that, Scholar had produced its own copy of the license agreement. But, I mean, yes, that normally you don't have to respond to discovery until after a case management conference, but why couldn't you have voluntarily produced either pursuant to... Your Honor, the transfer documents were confidential documents between a non-party in the case, and we had to wait for the entry of a protective order as well in the case before producing those documents. But they were produced early on in the case. There was no delay on our part. And secondly, I would like to point out... I would assume you'd have to produce them pursuant to your initial disclosures and not just wait for a request for that, correct? Your Honor, we produced them the first time that we were obligated to produce them under the procedures of the court below. But when the district court... When was that? When was that? How much time? May of 2010 is when we produced the documents. And the amended complaint was filed when? September of 2009. And the scheduling order... The scheduling conference and order was entered in January of 2010, Your Honor. Now, during the time period, which is significant, of when the court below granted the alternative motion to add Scholler as a plaintiff, which was... That was entered in July of 2009, I believe. And the amended complaint was... They had 60 days in which to file the amended complaint. And the amended complaint was filed, I believe, on September 19th of 2009. So almost a full 60 days. I think the order was July 21. During that entire 60 days, there was no request by Scholler to Orbis for any documents. They had every opportunity if they felt that they needed additional documents to request them from us. There was no request at all at the moment they filed the complaint. And the license agreement itself does not obligate the party on the other side to provide notice of the transfer of the license rights. In fact, the provision in Section 10.G, which talks about... applies in this case and allows for the proper transfer of the license rights without any approval of Scholler, it does not require that the transferor party has to provide any notice whatsoever to Scholler. That was not a requirement of the contract. And they accepted that risk. I don't think they conceded that. And so to try to put the burden on us to have to demonstrate it, I think is going beyond what was required in the contract. Can you clarify something for me? I'm confused by the reference to unlicensed products, that there were four categories of products that may not have been licensed that may have been the subject of this lawsuit and that this license wouldn't apply. Your Honor, there were over 50 products that were at issue. All but four products were covered by the license. And as to those four products, the plaintiff, once the license agreement was applied by the district court, the plaintiff lost standing in order to bring the remaining rest of the case, as to those four unlicensed products. The plaintiff meaning... Buckhorn. Because Buckhorn didn't have a license. Correct. That's correct. So Buckhorn did not have standing without Scholar being a party plaintiff to assert the rights. Okay. And Scholar didn't have the rights over those four products? That's what I'm trying to understand. Why wasn't Scholar enough to create the standing? Well, the district court held that there was no constitutional standing of Buckhorn to bring those claims out to those products. That was not appealed, and it's not subject to the statute. That's because Buckhorn had a license but not ownership in the patent. That's correct. So Scholar had to come in in order to provide jurisdiction. So Scholar didn't own those patents? No. Scholar owned the patent, but Buckhorn was merely a licensee. I would like to point out that... It sounds to me like there might have been a mistake there, but you're saying they didn't file it to appeal it. They did not appeal it, Your Honor. Yes, and in fact... But it's an odd result, isn't it? I don't believe so, because Buckhorn did not have standing to bring the claims without... But Scholar did. Yes, but Scholar was dismissed from the case by the court's ruling. Your Honor, I would like to point out that the Scholar, when I said, is the same entity as the signatory on the contract, the documents in the record show that there were merely name changes. And this is very significant, which was overlooked by the district judge. And this is shown in the appendix at A3821 and A3823, in that the actual signatory party, Perstorp-Zytec, and its CEO signed the document that that entity's name was changed from Perstorp-Zytec to Arca-Zytec in November of 1999, and then the name was changed again from Arca-Zytec to Scholar Arca Systems in April of 2005, and they are the plaintiff in this case. So really, we have the same entity here. It's just a different DBA doing business as... Well, I think it was actually the name of the company, yes, Your Honor. And exactly, it is one and the same entity, and so under the law, they are charged with knowledge of a document that they signed themselves, and that was the sole underpinning for the court's finding of unconscionability, because to address Your Honor's question of unconscionability, under California law, you obviously have to have two components, procedural unconscionability and substantive unconscionability, and the law in California requires that you must judge it at the time the contract is signed, not looking at it at a later date. Right, and the question should have been whether the provision itself was unconscionable when entered into, correct? Correct, Your Honor, and the record clearly shows that it was a negotiated agreement between two large companies represented by sophisticated counsel. It settled the lawsuit. There were compromises back and forth on what the terms were, and that's all in the record, and it was part of the give and take of having a fee-shifting provision should a subsequent dispute arise. Could the court, in assessing the propriety of any particular one, assuming that the fee provision applies, could the court consider things like the confusion or lack of knowledge in assessing what would be reasonable under that provision? No, Your Honor, because at the time the contract was entered into, there was no lack of knowledge or unreasonableness and no such fact. No, no, no. I'm saying, assuming it's not an unconscionable provision, but when the court determines how much, there is a reasonableness component written into the fee provision. Yes, Your Honor. The provision is not substantively unconscionable because one of the provisions in it, it does say reasonable attorney's fees, which would be determined in a subsequent proceeding. So could the court take into consideration some of these same facts that it was troubled by in determining what was reasonable? Well, I think what the court was supposedly troubled by really aren't correct items, but it would have to be sorted out below, obviously. I see I ran over my time. I was reserving. You're fine. I wanted to reserve some rebuttal. You have reserved rebuttal time. Thank you. Thank you very much. Let's restore Mr. Bono's full rebuttal time and give Mr. Grandinetti an extra four minutes if he needs to use it. Good morning. Please support this. Before I start, I would like to clarify at least one item in our brief. On page 17, we cite a case to Goodridge, and the standard being applied in that case is not abuse of discretion. It's more of a substantial evidence standard, and we wanted to correct that before. Also, you were talking about the unconscionability and basically whether or not the judge used the correct term or is using the correct standard there. We, in our brief, of course, explained that it would have been perhaps more appropriate to use inequitable or unreasonable terminology instead of unconscionable. We're reviewing what the district court ruled on, and we're looking at the opinion and not your arguments and your interpretation as to what the district court should have done. Let me ask you this question. What's a case law that supports the district court's finding on unconscionability The case law on unconscionability. That applies to this case, a fee-shipping provision and a patent license. The court is relying more on the excess case and that. There's two things going on here. First of all, the judge did, in his order, he explained unconscionability. He talked about procedural and substantive unconscionability. It's clear that he was analyzing unconscionability. When he said it was unconscionable, he wasn't referring to the contract or how the contract was drafted or the status of the parties at the time they entered into the contract, or the license, rather. What he was referring to was that the parties didn't have notice or weren't aware that the license existed at the time that the litigation started. So they started litigation, and unbeknownst to them, they had this fee-shifting provision that could apply. And that's why we made the point that it would have been more appropriate to use inequitability or unreasonableness when he starts talking about this. So are you conceding that the district court was incorrect? When it comes to any facts after the agreement, the ROPAC agreement was signed, yes. He should have been talking about inequitability. Now, if we're talking about this knowledge of the chain of title, it's striking that Scholder never says that they didn't have knowledge of the agreement. Can I, just a snippet, and then, I don't want to be rude. Go. Speak. Okay. When trying to figure out why the judge went from unconscionability into knowledge of the license by Scholder or by Lockhorn, the best that we can offer here is that, almost simultaneously, he was making a decision on summary judgment. And in the summary judgment decision, there was a lot of evidence put on that, at the time of the ROPAC license agreement, the ROPAC settlement agreement, ROPAC knew that it was being acquired by LINPAC. And LINPAC was a bigger competitor and, at the time, was the owner of the Friedrich patents. And if I could draw your attention to this paragraph. Okay, but knowing whether or not the transfer provision was complied with is a very different factor than knowing about the license agreement and the fee shifting provision, correct? Correct. So you're saying they may not have been absolutely positive that they could enforce this fee shifting agreement, but they knew about, or enforce the license, but they knew about the license. What I'm trying to say is that, at the time the judge wrote his order, he had recent knowledge of facts that involved that settlement negotiation way back when. And in particular, in paragraph 7, which is appendix A-949, that paragraph talks about how a transfer isn't to be made to a company that owns the Friedrich patents. By the time that agreement, the ROPAC agreement, was signed, ROPAC actually had been taken over by LINPAC, who was the owner of these Friedrich patents. Right, but at the time, if you want to talk about recent knowledge and recent facts, he also knew that he had just ruled that there was no violation of that transfer provision. Correct. I'm trying to give an explanation, but I'm not trying to make excuses for the judge. I mean, all I can guess... The judge is basing his opinion on the fact that Scholar doesn't know, but Scholar never admits that. Can you help us out there? Both parties, if you go back 20 years, had multiple changes in entities, and name changes, and so on. Those things you can check out relatively quickly. Did Scholar know from the outset of the existence of this license? No, but I need to give you an explanation. There was recently, just before the litigation, a major management change at Scholar, and all the old people that would have had corporate knowledge but one, were pretty much gone. The person who had the corporate knowledge is a guy by the name of Joe Oates, who went back to the original Zytec company. But he had no first-hand knowledge of the settlement agreement. At that time, he was a low-level person. But he was your 30B witness, who you designated. He couldn't have been that low-level. He was the only one we had. He was the only one we had that could answer certain questions, yes. He was the only one. So he was your institutional knowledge, and he conceded that he knew about it. And he told you about it in the answer. Yeah, he knew about it, but his knowledge was not first-hand. It was hearsay. As I recall, he had never seen the agreement until perhaps his deposition. And I want to point out— Because you produced the agreement. We produced the partial agreement. But at the deposition, Joe Oates' deposition in Chicago, Orbis produced a full copy. They had a full copy of the agreement. The problem was is when they did produce it, they stamped it attorney's eyes only. And it was at the Joe Oates' deposition sometime later, much later, that we asked for them to remove that designation so that we could show it to Scholar, the complete copy. Now, Scholar had the first part of the agreement. But it was a ragged copy. And it was deep in the storage of documents. And the people who were at Scholar at that time were unaware of it. But the heavy provision and the transfer provision are broadly worded. They don't require knowledge. They are enforceable on their own, are they not? They are for litigation based on that agreement. Now, Buckhorn brought the case. Why is it that Scholar and Buckhorn didn't drop the case after the deposition occurred, as you say, and they had no agility? I mean, it seems to me that even at that point, you have Scholar and Buckhorn together that are continuing to pursue the litigation, knowing about the existence of a license. It was never clear that Orbis had a proper transfer. If the court would look at the stock purchase agreement, this is at A1086 and 1136, there are a number of pages before page 1136 wherein Orbis – Now you're arguing the other side of the coin, you know, what the other party knew. I'm asking you questions about what Scholar and Buckhorn knew. I mean, you knew at the time of the deposition that the license existed. You knew about the fee-shifting provision, because that's what we're talking about here, the fee-shifting provision. And you knew it existed at least as of the time of the deposition. But yet you continued with the litigation. It's because we had no evidence that we could rely on that Orbis was actually a party to that license. In this document, there are six additional pages where Orbis wrote in indemnification clauses specific to this patent. Okay, but you knew as of the answer being filed that there was a risk that if you continued to fight their – if you tried to assert a defense under the license that you might be at risk for a transfer of attorney's fees, right? It's in the contract. No, at the time, we made it very clear that if they could show a chain of title which could be relied upon, it could be easily understood that we would drop the case. And I will point out – I'm having a hard time following your argument because, I mean, you sued Orbis for patent infringement. So you know they're practicing the patent. The additional pages, as well as page 1136, shows that when Orbis acquired the rights under this patent, it had serious concerns about whether or not the ownership was complete. They worked in a lot of indemnification clauses so that if they got sued specifically on this patent, that LINPAC would pick up the bill for a large portion of it. Right. But ultimately, the trial court disagreed with you on whether or not the license had been properly transferred and whether the transfer agreement had been violated. And you didn't appeal that. That's our point. So you took a risk. No. The only clear evidence that our clients ever had that Orbis was a licensee is when they received the judge's summary judgment order. At that point, they stopped the case. They abided by what they said years earlier. It would have been nice had it been clear. But it was not clear. The judge took a lot of time and agonized over the chain of title. And you're right. We didn't appeal it. At that point, the client was done. They were fed up. Your alternative arguments that you make with respect to what their hourly rate was and whether they should have used D.C. counsel versus Ohio counsel, etc., those all go to the reasonableness of any award, not to whether or not the contract is enforceable, right? Correct. There's a discussion here as to what the review standard is. And if it is de novo, this court has the ability to, for example, look at whether or not the judge should have applied inevitability and unreasonableness or the other standard about the reasonableness of the fees. That's why that section was put in there. It's basically if this court chooses to look at that, we try to give you the facts and the law to support it. Okay. I have the pages that come before page 50 on the stock purchase agreement. If the court would like it, I could offer it now or we could submit it later. If we were to fine against you, what would we do? Would we remand for an accounting of attorney's fees? What would be your position at that point? I don't think it's necessary to do that. I think that this court, like I said, can look at whether or not the lack of notice as the judge lays it out, fits within inequitability and unreasonableness. But if it's to be sent back to Judge Black, I would think that that would be the question to him, is whether or not he applied that standard or give him the opportunity to flesh out his unconscionability  Instead we just flat out reverse the district court and say, you got it wrong. What's left to do? Do we set the fee or do we send that back down to have the district court do an accounting and test you the reasonableness of the fees? I believe it should be sent to the court for an accounting. Before you finish up, can you explain to me what happened to these four unlicensed products that you dismissed? You dismissed the claims of Precious, right? Or Buckhorn did? The Precious did, yes. Why did Scholar lose standing as to those products? What happened is when the summary judgment decision came out and suddenly it was clear that Orvis is a licensee and that that ROPAC license is legitimate, not the correct term, Buckhorn was no longer an exclusive licensee. Buckhorn, who was carrying the water in this case, no longer had a right to be in the case. So that left... So those other products were unlicensed? Correct. They were unlicensed. The damages on them were much less, but without Buckhorn in the fight, Scholar, particularly in view of the amount of damages, chose not to proceed. At the time, the judge was talking about the parties bearing costs, and when we presented the motion to dismiss, we asked that the judge make it conditional on that. But when his order came out, he never addressed that. And then it was later that we got into whether or not attorney's fees should be awarded. And you didn't ask him, under 60B or otherwise, to reopen with respect to those four products? No. The client did not want to proceed with patent litigation. So Buckhorn dragged Scholar into this, but when Buckhorn stopped driving the train and Scholar realizes it might be on the hook for all these attorney's fees, then they say, we need to get out of here. That is an unfair characterization. What happened is that Buckhorn negotiated with Scholar what Buckhorn believed to be an exclusive license. Buckhorn, initially, believed that it could proceed without Scholar because Buckhorn believed it had an exclusive license. And then, as this unfolded, particularly at the point of the summary judgment decision, it becomes clear to Buckhorn that what they paid Scholar for was not an exclusive license. Okay. So there was a little more to it emotionally. Got it. I have one final question as to when Buckhorn had notice about Orbis being a licensee or potential licensee. In fact, Orbis asserted that they were a licensee as an affirmative defense, but wasn't there a counsel-to-counsel call before the lawsuit was filed and Buckhorn was put on notice that Orbis felt it was a licensee that had a license to these products? First of all, early on, there was a LINPAC organization that was also a defendant. And my recollection is that the counsel we talked to in Chicago was representing both parties. But the rumor of a license was there before the case was filed, and there's ample documentation that we asked for both copies of it as well as a clear chain of title. And then Orbis asserted that as their 11th affirmative defense. Correct. Yes. At which point we did our discovery requests. And all the way up to the end, the chain of title was just not clear. I mean, we had as much apprehension as Orbis did when they signed the agreement. So why would the district court say that the parties had no notice of a license during the litigation? No, the district court saying that there was no notice of a license for a very long time into the litigation. But yet the record shows that everybody had notice of a license, at least potential license, prior to the... Why didn't anybody speak up? Why didn't Schoeller or Buckler at that point in time say, Court, excuse me, we have a problem here. I mean, we did know about it before this litigation began. There's a back story to this. Our discovery requests focused very much on show us the license and show us the chain of title. And those got out early in the case. We did not get the production as the court found out. There were a lot of fights over it. Early in the case, there was a magistrate in charge of the case. He even did the Markman hearing. And motions to compel, motions for attorney's fees at some point, were being filed. And at one point, there were 21 motions, fully briefed, stacked up on the magistrate's register. And at the Markman hearing, he announced to us that he was retiring within two weeks. It was sometime after the Markman hearing and the retirement that Judge Black picked these up. So, a lot of this was requested. It just was never addressed. Was there ever an effort to stay all of the patent aspects of the case pending a determination of the legitimacy of this license? Neither side asked to stay. There was a very slow unfilling of the onion. But once the documents were there, once we were permitted to go out and depose Ropak and Lindpak and some other folks, at that point, the parties just immediately went into the court and said, you know, we don't believe the license was transferred properly or ever transferred. And that was this under-judgment motion. So, the answer is there was no stay. But as soon as the evidence was completed, that was a long time. Yes, the first thing we did was do the summer judgment. Thank you, Mr. Grandinetti. Mr. Bono? Thank you, Your Honor. Can I just go to that last question that I just asked? Why didn't you say to the trial judge or to magistrate judge Merz, I think it was, why didn't you say, stop, we shouldn't be having Markman hearings, we shouldn't be doing anything, let's just focus on the license so that everybody can get out of here as cheaply as possible? Your Honor, we did file a motion to stay the case, pending a determination on the license defense. Plaintiff opposed it and the judge denied it. When did you file that motion? I don't have that in front of me right now. I assume it's in the docket. It's in the docket, yes, Your Honor. Okay. But we did try that, plaintiff opposed it. Your Honor, on those four products, when the finding of the court was that Orbis was licensed, those products also became licensed back to the time the complaint was filed. So that was, I misspoke earlier when I said they weren't licensed. They did become licensed products as well. I wanted to clarify that. Your Honor, with respect to the partial agreement that plaintiff said, they only had a partial agreement, well, that's true and not true. They had the entire substance of the agreement. The one thing they didn't have in their files was only Exhibit B, which was the publicly filed consent and stipulated dismissal. But the entire body of the agreement they had in their files, they produced it as the very first document that they produced. They labeled it SAS 2-8. Did they have the attachments that showed what the patents were?  And the products, and Exhibit B? Exhibit B, yes. And that is in the appendix, Your Honor. Well, I saw the actual documents in the appendix, but I'm saying did they have that? Yes, correct. And they produced it as one of their first documents produced. Yes, they had that. Your Honor, the simple matter is that plaintiff argues to this court, as it did below, that they were never sure about the transfer, Your Honor, because they had never had enough information. Your Honor, it's very clear from the record here that plaintiff would never say and never agree that it was clear enough or they had enough information. And the record shows that. They took innumerable depositions. Even when we filed after Mr. Oates' deposition, and when we filed summary judgment, they asked for more depositions. They said that they couldn't respond to our summary judgment because they needed more depositions. So they took depositions of, I think, the counsel who handled the transfer negotiations, and they asked for a little more. Well, what about the missing documents that they said were, there were documents missing from what you produced? No, they, we produced all those documents in May 2010. They had all the documents. There were no additional documents. So that's simply a false accusation. They had all the documents soon after the complaint was filed. Your Honor, even after the court granted the summary judgment motion on license, they filed a motion for reconsideration, still contesting the transfer provision and the application of the license agreement. It's clear in this record they never would accept that they had enough information. They just never would. And why? This was a case of major importance to the plaintiff. They sought $14.4 million in single damages. That's at A3871 of the appendix in their damage report. They demanded trebling of those damages to $43 million, plus an award of attorney's fees and costs in this case. Your Honor, what's clear here, as a sophisticated company, they, just like you were asking and Judge Raynor was asking, they made a calculated decision in this case with full knowledge of the risks to pursue this to the nth degree to see whether they could win. And they took the risk that the attorney fee provision would be applied and they would have to pay our attorney's fees. This is a knowing risk accepted by them because they were playing with a lot of money that they wanted to try to get. And as it turned out, they lost. There's no reason whatsoever not to apply the fee-shifting provision under these circumstances. Thank you very much, Your Honor. Thank you, Mr. Bono.